IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| MARKET SCAN INFORMATION | : | |
| SYSTEMS, INC., | : | |
| | | |
| Plaintiff, | : | |
| | | Case No. 3:06cv254 |
| vs. | : | |
| | | JUDGE WALTER HERBERT RICE |
| THE REYNOLDS AND REYNOLDS | : | |
| COMPANY, et al., | : | **TO BE FILED UNDER SEAL** |
| | | |
| Defendants. | : | |

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT REYNOLDS AND REYNOLDS COMPANY
(DOC. #108); DECISION AND ENTRY SUSTAINING MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT MICHAEL SCHIMMANG
(DOC. #109); EXPRESS DIRECTION, IN ACCORDANCE WITH FED. R.
CIV. P. 54(b), THAT FINAL JUDGMENT IS TO BE ENTERED IN FAVOR
OF DEFENDANTS AND AGAINST PLAINTIFF; FINDING OF NO JUST
CAUSE FOR DELAY; CONFERENCE CALL SET

---

Plaintiff Market Scan Information Systems, Inc. ("Plaintiff" or "Market

Scan"), and Defendant Reynolds and Reynolds Company ("R&R") are competitors

in the rates and residuals business.[1]  "Rates" refer to the interest rates which

---

[1]Although the basic factual setting which gave rise to this litigation is not in
dispute, this Court describes that setting in the manner most favorable to the
Plaintiff, given that this litigation comes before the Court on the Defendants'
Motions for Summary Judgment (Docs. ##108 and 109).

lenders charge on car loans, while "residuals" refer to the residual value of a vehicle at the expiration of a lease. R&R and Market Scan obtain the rates information from lenders and residuals information from commercial vendors of same. Plaintiff and R&R must then enter this information into computer systems, which build databases. The end product is information which permits car dealerships to find financing options for their customers, using different parameters, such as the least expensive monthly payments for the customer or the most profitable financing option for the dealership. Market Scan and R&R sell that information to the car dealerships.

While Market Scan has been in the rates and residuals business for more than 25 years, R&R started offering rates and residuals data to customers only in 2004. Later that year, R&R stopped offering that product to new customers, due to the high cost of that product and the number of customer complaints it had generated. Deeming a rates and residuals product to be critical, R&R concluded that it had but three options, to wit: 1) build a successful product itself; 2) partner with a competitor; and 3) purchase it from another entity. In 2005, R&R launched Project Boron, under which it explored the possibility of purchasing the Plaintiff, which had been selling its rates and residuals product for more than 25 years.[2] In order to permit R&R to perform its due diligence on that possible transaction, the two entered into a non-disclosure agreement ("NDA"), on August 29, 2005. Under the NDA, R&R agreed not to use or to disclose any of Market Scan's confidential information it obtained during the due diligence process. The NDA also prohibited

_____

[2]Plaintiff also explored the second option with Project Titanium, which encompassed discussions with Dealer Track, a competitor, about a strategic partnership.

R&R from hiring Plaintiff's employees for a period of one year after the execution of that agreement and required R&R to return or to destroy confidential information at the conclusion of the due diligence process.[3]  During the conduct of the due diligence, employees of R&R spoke with Defendant Michael Schimmang ("Schimmang"), who was then the Director of Market Scan's Data Department.  By the end of 2005, R&R had decided to forgo the purchase of Market Scan.

Schimmang commenced his employment with Market Scan on June 5, 1997.  Two months later, in August, 1997, the Plaintiff required him to sign a non-competition agreement.  That agreement provided that it was in consideration of his continued employment at Market Scan.  In addition, the non-competition agreement prohibited him, inter alia, from working for a competitor of Market Scan for a period of one year after the termination of his employment with Plaintiff.  Thereafter, during his employment with Market Scan, Schimmang was required to sign two identically worded Acknowledgments, in connection with Market Scan's employee handbook.  Each of those documents provides that "I understand that this constitutes the entire agreement between me and the Company regarding my at-will employment status, and that it supersedes any prior written, oral or implied agreements concerning this subject."  See Doc. #50 at Ex. #152; Dep. of Bruce Zeedik at 70-72.[4]

---

[3]The NDA imposed the same obligations upon Market Scan as it did upon R&R. The Court focuses upon the obligations imposed upon R&R, because Plaintiff has alleged that R&R breached them.

[4]Zeedik is the Chief Financial Officer of Market Scan.  Among his other duties in that position, he oversees Plaintiff's Human Resources staff.

In 2006, a manager of R&R's rates and residuals operations team resigned for personal reasons.[5]  R&R advertised nationally for a replacement.  Mary Poynter ("Poynter"), the supervisor of the open position, and Poornima Siddapur ("Siddapur"), an employee in R&R's human relations department located in Dayton, interviewed a number of candidates.[6]  Nevertheless, R&R was not able to locate a suitable replacement.  Accordingly, Chris Morris ("Morris"), director of F&I solutions for R&R,[7] suggested that Siddapur contact other entities in the rates and residuals industry in order to ask whether they were aware of an appropriate replacement.  In particular, Morris encouraged Siddapur to contact Schimmang.  Morris had been intimately involved in Project Boron, as one of the members of R&R's due diligence team.  He was, therefore, aware that the NDA prohibited R&R from hiring Schimmang, an employee of Market Scan, before August 29, 2006, the anniversary of the execution of that document.  Morris did not, however, so inform Siddapur, who was not aware of that prohibition.  Accordingly, on March 30, 2006, Siddapur contacted Schimmang, intending to use him as a resource to ask whether he knew anyone who would be appropriate for the open position.  Schimmang indicated that he would be interested.  After questioning him about his experience, Siddapur told him to submit his resume, which she shared with Poynter.

---

[5]That team is located in Duluth, Georgia.

[6]Neither Poynter nor Siddapur was aware of Project Boron.

[7]"F&I" is an acronym for finance and insurance.  R&R's rates and residuals was part of F&I.

Thinking that Morris had recommended him for the position, Schimmang sent him a thank you note by email.  Knowing that the NDA prohibited R&R from hiring Schimmang, Morris told Poynter and Siddapur that Schimmang could not be considered for the opening.  Schimmang was notified of that fact.  Thereafter, R&R continued its unsuccessful efforts to fill the open position in Duluth, without having further contact with Schimmang.

On May 16, 2006, Schimmang delivered a resignation letter to Rusty West ("West"), the President of Market Scan.  Schimmang indicated that he wanted his last day at Market Scan to be on June 5th.  Schimmang explained that he was resigning from Market Scan in order to leave California and to escape its high cost of living.  He planned to move to Texas, where he could afford to buy a house and could legally own a pit bull.  On May 22, 2006, Schimmang sent an email to Siddapur, enclosing a copy of his resignation letter and indicating that he planned to apply for the position in Duluth after his last day of employment with Market Scan.  After that employment had terminated, Poynter conducted a telephone interview with Schimmang on June 16, 2006, and interviewed him in person in Duluth on June 23rd.  R&R hired Schimmang for the position.  His employment began on July 17, 2006, the day upon which Plaintiff initiated this litigation.

In its Second Amended Complaint (Doc. #103), Market Scan has set forth six claims for relief, to wit: 1) a claim of misappropriation of trade secrets asserted against both Defendants (First Claim for Relief); 2) a separate claim of breach of contract against each Defendant, alleging that Schimmang breached the non-compete agreement and that R&R breached the NDA (Second Claim for Relief); 3) a separate claim of intentional interference with contractual relations against

each Defendant, alleging that Schimmang intentionally interfered with its contract with R&R (the NDA) and that R&R interfered with Market Scan's non-competition agreement with Schimmang (Third Claim for Relief);[8] 4) a claim of civil conspiracy against both Defendants (Fourth Claim for Relief); 5) a claim of unjust enrichment against both Defendants (Fifth Claim for Relief); and 6) a claim of breach of fiduciary duty against Schimmang (Sixth Claim for Relief).

This case is now before the Court on Motions for Summary Judgment filed by R&R (Doc. #108) and Schimmang (Doc. #109). As a means of analysis, the Court will initially review the procedural standards it must apply whenever it rules on a motion for summary judgment.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

---

[8]Based upon reasoning set forth below, this Court concludes that the law of California governs the Plaintiff's tort claims against R&R and Schimmang. A claim of intentional interference with contractual relations under California law is similar, but not identical, to a claim of tortious interference with contractual relations under the law of Ohio. Compare Sole Energy Co. v. Petrominerals Corp., 128 Cal. App.4th 212, 237-38, 26 Cal. Rptr.3d 798, 817 (2005) (setting forth the elements of a claim of intentional interference with contractual relations under California law), with Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St.3d 171-72, 707 N.E.2d 853, 855 (1999) (¶ 1 of the syllabus) (setting forth the elements of a claim of tortious interference with contractual relations under Ohio law).

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could

reasonably find for the plaintiff.").  Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party.  Anderson, 477 U.S. at 255 (emphasis added).  If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder.  10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726.  In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).  See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992)

("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

Schimmang seeks summary judgment on all six of Plaintiff's claims, while R&R seeks summary judgment on the five claims Plaintiff has asserted against it. As a means of analysis, the Court, with one exception, will address the parties' arguments in support of and in opposition to summary judgment on those claims, in the order in which they appear in Plaintiff's Second Amended Complaint (Doc. #103). The one exception is that the Court will address the Plaintiff's First Claim for Relief, alleging that the Defendants misappropriated its trade secrets, last. However, before engaging in that analysis, the Court will resolve the dispute between Market Scan and R&R concerning which state's substantive law must be applied to resolve the Plaintiff's tort claims, i.e., all claims other than its Second Claim for Relief which is for breach of contract. Market Scan, a citizen of California, insists that this Court apply the substantive law of Ohio, while the Ohio citizen, R&R, insists that the substantive law of California is applicable. For reasons which follow, this Court concludes that it must apply the substantive law of California.

It is axiomatic that a District Court exercising diversity jurisdiction must apply the choice of law principles of the forum state. <u>Klaxon Co. v. Stentor</u>

Electric Mfg. Co., 313 U.S. 487 (1941); Spence v. Miles Laboratories, Inc., 37
F.3d 1185, 1188 (6th Cir. 1994).  Accordingly, the Court turns to Ohio's choice-of-
law principles.

Recently, in Glidden Co. v. Lumbermens Mut. Cas. Co., 112 Ohio St.3d
470, 861 N.E.2d 109 (2006), the Ohio Supreme Court held in ¶ 1 of the syllabus
that "[a]n actual conflict between Ohio law and the law of another jurisdiction
must exist before a choice-of-law analysis is undertaken."  Therein, the Ohio
Supreme Court concluded that an actual conflict between the law of Ohio and that
of New York did not exist, because an earlier decision by that court had addressed
the precise issue, while New York courts had not done so.  Therefore, the Glidden
court held that Ohio law applied, without having conducted a choice-of-law
analysis.  Relying upon Glidden, Plaintiff argues that this Court must apply the law
of Ohio, because an actual conflict between Ohio and California law does not exist,
given that each state has adopted a form of the Uniform Trade Secrets Act
("UTSA").  See  Plaintiff's Consolidated Memorandum in Opposition to Defendants'
Motions for Summary Judgment ("Plaintiff's Consolidated Memorandum")
(Doc. #116) at 16.  R&R, in contrast, argues that an actual conflict between the
substantive law of Ohio and that of California does exist, which mandates an
application of Ohio's choice-of-law principles.  In addition, R&R contends that
applying those principles results in the conclusion that the substantive law of
California is applicable.  Schimmang also argues that this Court should apply the
substantive law of California.  See Doc. #109 at 9-10.  As an initial matter, the
Court sets forth its reasons for concluding that there is an actual conflict between
the law of California and that of Ohio.

Under Ohio law, a covenant not to compete is enforced to the extent that it is reasonable, that is as long as its reach is no greater than necessary to protect the employer's legitimate interests.  Raimonde v. Van Vlerah, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975) (¶¶ 1 and 2 of the syllabus).  As is discussed in detail below, covenants not to compete are most decidedly disfavored under California law.  Since a valid contract is an element of intentional (California law) and tortious (Ohio law) interference with contractual relations, there is an actual conflict between the substantive laws of those states with respect to that claim.  Moreover, California courts have rejected the use of the inevitable disclosure doctrine to supplement a covenant not to compete, to alter its meaning, or to make an otherwise unenforceable covenant enforceable.[9]  Whyte v. Schlage Lock Co., 101 Cal. App.4th 1441, 1463, 125 Cal. Rptr.2d 277, 293-94 (2002).  Ohio courts, in contrast, have favorably applied that doctrine.  See Proctor & Gamble Co. v. Stoneham, 140 Ohio App.3d 260, 274, 747 N.E.2d 268, 279 (2000).  In addition, while the torts of intentional interference with contractual relations under California law and tortious interference with contractual relations under Ohio law are similar, there is a major difference between them.  Under Ohio law, the plaintiff must prove that the interference was improper (Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St.3d 171, 172, 707 N.E.2d 853, 855 (1999) (¶ 2 of the syllabus)), while the interference, itself, need not be wrongful under California law.  Sole Energy Co. v. Petrominerals Corp., 128 Cal. App.4th 212, 238, 26 Cal.

---

[9]Under the inevitable disclosure doctrine, "a [former employer] may prove a claim of trade secret misappropriation by demonstrating that [its former employee's] new employment will inevitably lead him to rely on the plaintiff's trade secrets."  PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995).

Rptr.3d 798, 817 (2005).  Therefore, this Court concludes that there is an actual

conflict between the law of Ohio and that of California.  Accordingly, it turns to

the choice-of-law principles of the former, the forum state, in order to ascertain

which state's law must be utilized in this litigation.

In Morgan v. Biro Corp., 15 Ohio St.3d 339, 474 N.E.2d (1984), the Ohio

Supreme Court indicated, inter alia, that § 145 of the Restatement, Second,

Conflict of Laws would be utilized to determine which state's substantive law must

be applied in a tort action.  Section 145 provides:

§ 145 The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are
determined by the local law of the state which, with respect to that issue,
has the most significant relationship to the occurrence and the parties under
the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to
determine the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place
of business of the parties, and
(d) the place where the relationship, if any, between the parties is
centered.

These contacts are to be evaluated according to their relative importance
with respect to the particular issue.

Although the Plaintiff has not argued that those factors mandate the application of

Ohio law, this Court will briefly set forth its reasoning for concluding that the

factors set forth in § 145 mandate the utilization of California law to resolve

Plaintiff's tort claims.

The injuries allegedly suffered by the Plaintiff occurred in California, where it is located.  The conduct causing that alleged injury occurred in California, where R&R and Schimmang gained their knowledge of Plaintiff's alleged trade secrets, and Georgia, where R&R was developing its new rates and residuals product and where it employed Schimmang and, thus, the place where those alleged trade secrets would have been used by R&R and Schimmang.  Plaintiff is a California corporation with its place of business in that state.  R&R, by contrast, is located in Ohio, while Schimmang is now a citizen of Georgia, having relocated from California where he worked for Plaintiff.  Plaintiff's relationships with the Defendants centered in California, where Schimmang was employed by Market Scan and R&R conducted its due diligence of the Plaintiff.  Contrasting the sole contact between Ohio and this litigation, the fact that R&R is located within this state, with the numerous contacts of California to this litigation, leads to the inescapable conclusion that California law must be utilized to resolve the Plaintiff's tort claims.[10]

A.  Breach of Contract (Second Claim for Relief)

Plaintiff Second Claim for Relief is, in reality, two separate claims for relief, to wit: a claim that Schimmang breached the non-competition agreement between himself and Plaintiff; and a claim that R&R breached the NDA.  As a means of

---

[10]Section 6 of the Restatement, Second, Conflict of Laws, which is referred to in § 145, contains general factors which are relevant to every choice-of-law question, such as the needs of the interstate and international systems, the policies of the forum state and the relevant policies and interests of other interested states.  None of those factors has caused this Court to alter its conclusion that the substantive law of California must be utilized to resolve the Plaintiff's tort claims.

analysis, the Court will address Plaintiff's claim that Schimmang breached the non-competition agreement, before turning to its claims that R&R breached the ADA.

1.  Schimmang's Alleged Breach of the Non-Competition Agreement

Plaintiff contends that Schimmang has breached the non-competition agreement with it by accepting employment with R&R.[11]  See Plaintiff's Consolidated Memorandum (Doc. #116) at 32-33.  With that non-competition agreement, Schimmang promised that, for a period of one year after the termination of his employment, he would not in any way be involved in a competitive business, on his own account or, inter alia, as an employee of another. Without challenging that he is presently employed by a competitor of his former employer, Schimmang argues that the non-competition agreement is not enforceable.

Initially, he contends that the non-competition agreement was superseded and replaced by two identically worded Acknowledgments he was required to sign in connection with Market Scan's employee handbook.  Each of those documents provides that "I understand that this constitutes the entire agreement between me and the Company regarding my at-will employment status, and that it supersedes any prior written, oral or implied agreements concerning this subject."  This Court cannot agree with Schimmang that the Acknowledgments superseded and replaced the non-competition agreement he had executed earlier, given that the non-

_____

[11]Both Market Scan and Schimmang agree that this aspect of Plaintiff's Second Claim for Relief is governed by the substantive of California, the state where Market Scan employed Schimmang and where he executed the non-competition agreement.

competition agreement does not concern the subject of his status as an at-will employee, which is the topic addressed by the Acknowledgments.

Alternatively, the Defendants contend that the non-competition agreement is void under California law.[12]  Section 16600 of the California Business and Professional Code provides "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  The exceptions are set forth in §§ 16601, 16602 and § 16602.5, which provide that the prohibition contained in § 16600 does not apply to the sale of the good will of a business and to agreements in anticipation of the termination of a partnership or limited liability company.  Although not contending that any of the statutory exceptions are applicable, the Plaintiff contends that this Court should apply two non-statutory exceptions, which this Court addresses in the order presented.

Initially, Plaintiff argues that California courts have recognized a non-statutory exception where a non-competition agreement is necessary to protect trade secrets.  See Doc. #116 at 33-34.  This Court agrees with Plaintiff that California courts have recognized such a non-statutory exception.  See e.g., Alliance Payment Systems, Inc. v. Walczer, 152 Cal. App.4th 620, 61 Cal. Rptr.3d 789 (2007); Thompson v. Impaxx, Inc., 113 Cal. App.4th 1425, 1429-1430, 7 Cal. Rptr.3d 427, 430 (2003).  However, given that California courts do not

_____

[12]R&R has fully joined Schimmang in the argument that the non-competition agreement is void under California law, given that the Plaintiff contends that it (R&R) intentionally interfered with that contract.  Under California law, the existence of a valid contract between the plaintiff and a third-party is one of the essential elements of a claim of intentional interference.  See e.g., Sole Energy Co. v. Petrominerals Corp., 128 Cal. App.4th 212, 237, 26 Cal. Rptr.3d 798, 817 (2005).

recognize the inevitable disclosure doctrine, the trade secrets exception would only apply if there is proof of actual or threatened misappropriation of trade secrets. Whyte v. Schlage Lock Co., supra. Thus, whether this exception is applicable depends upon whether the items in question are trade secrets under the applicable law.

Alternatively, Plaintiff argues that California courts will enforce non-competition agreements, as long as the employee is barred from only a small or limited portion of a business or trade. See Doc. #116 at 34-35. In support of that proposition, Plaintiff places primary reliance upon Boughton v. Socony Mobil Co., 231 Cal App.2d 188, 41 Cal. Rptr. 714 (1964), a decision which is clearly distinguishable from this litigation. Therein, the defendant's predecessor conveyed real estate to plaintiff's predecessor. The deed by which the property had been conveyed contained a restriction, prohibiting the grantee (and its successor) from dispensing petroleum products. The plaintiff brought suit, seeking to have the restriction declared void, in violation of § 16600. The California Court of Appeals affirmed the decision to enter judgment in favor of the defendant. Initially, the appellate court noted that the deed restriction merely limited the uses to which the property could be put and that California courts have upheld restrictions on the use of property, as long as the restriction did not create a monopoly. Id. at 191-92, 41 Cal. Rptr. at 715-16. In course of its decision, the Boughton court wrote:

> Moreover, while the cases are uniform in refusing to enforce a contract wherein one is restrained from pursuing an entire business, trade or profession, as falling within the ambit of section 16600 (Callahan v. Donnolly (1872), 45 Cal. 152; Pacific Wharf and Storage Co. v. Standard American Dredging Co. (1920), 184 Cal. 21, 192 P. 847; Summerhays v. Scheu (1935), 10 Cal. App.2d 574, 52 P.2d 512; Hunter v. Superior Court (1939), 36 Cal. App.2d 100, 97 P.2d 492), where one is barred from

pursuing only a small or limited part of a business, trade or profession, the contract has been upheld as valid.

Id. at 192, 41 Cal. Rptr. at 716.  According to Plaintiff, that language from Boughton means that California courts recognize a non-statutory exception to § 16600 for instances where the non-competition agreement bars the employee from only a small or limited part of a business or trade.  Given that the Boughton court was not called upon to decide whether such a non-statutory exception exists, because the restriction therein involved the use to which real estate could be put, rather than restraining someone from pursuing a lawful trade, this Court cannot agree with Market Scan that the quoted language from that decision supports its contention in that regard.   In addition, it bears noting that none of the cases cited in the quoted passage from Boughton involved a non-competition agreement between an employee and his employer.

Plaintiff also has cited decisions by the Ninth Circuit, which it argues have recognized the existence of such a non-statutory exception.  Two of the cases cited are clearly distinguishable.  The Ninth Circuit decided the validity of the non-competition agreement, involved in IBM Corp. v. Bajorek, 191 F.3d 888 (9th Cir. 1997), under New York law, while General Commercial Packaging, Inc. v. TPS Package Engineering, Inc., 126 F.3d 1131 (9th Cir. 1997), did not involve a non-competition agreement between an employer and employee.  Rather, that lawsuit arose out of a restriction in a contract between a contractor and subcontractor which prevented the latter from soliciting one particular customer.  However, this Court will assume for present purposes that, in Campbell v. Board of Trustees of Leland Stanford Junior Univ., 817 F.2d 499 (9th Cir. 1987), the Ninth Circuit recognized a non-statutory exception to the prohibition against non-competition

agreements, set forth in § 16600, for agreements which bar an employee from only a small or limited part of a business or trade.[13]  That decision is not, however, persuasive, given that, in <u>Alliance Payment Systems, Inc.</u>, <u>supra</u>, a California appellate court, in a decision involving a non-competition agreement, expressly rejected the existence of such an exception, writing:

> We will assume for the sake of argument that the APS retained accounts do not represent a substantial segment of the merchant service provider market.  However, we are not persuaded that the Ninth Circuit's de minimis exception to section 16600 is consistent with the language or the purpose of the statute.  The statute voids every contract restraining trade "to th[e] extent" of the restraint, leaving no room to deem restraints too minor to be unlawful.  The statute was originally enacted to abrogate the common law rule allowing "reasonable" restraints of trade (<u>Hill Medical Corp. v. Wycoff</u> [(2001) 86 Cal. App.4th 895, 900-901, 103 Cal. Rptr.2d 779]; <u>Bosley Medical Group v. Abramson</u> [(1984) 161 Cal. App.3d 284, 288, 207 Cal. Rptr. 477]), under which "'an agreement in <u>partial</u> restraint of trade, restricting it within certain reasonable limits or times, or confining it to particular persons, would, if founded upon a good and valuable consideration, be valid....'" (<u>Wright v. Ryder</u> (1868) 36 Cal. 342, 358, italics in original.)  "The statute makes no exception in favor of contracts only in partial restraint of trade." (<u>Chamberlain v. Augustine</u> [(1916) 172 Cal. 285, 289, 156 P. 479].)
>
> "California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue <u>any</u> lawful employment and enterprise of their choice." (<u>Metro Traffic Control, Inc. v. Shadow Traffic Network</u> (1994) 22 Cal. App.4th 853, 859, 27 Cal. Rptr.2d 573, italics added.)  In rejecting the narrow restraint exception, we follow in the footsteps of "the California courts [which] have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." (<u>Scott v. Snelling and Snelling, Inc.</u> (N.D.Cal.1990) 732 F. Supp. 1034, 1042.)

152 Cal. App.4th at 636, 61 Cal. Rptr.3d at 803.

---

[13]It is not entirely clear that the contract at issue therein was a non-competition agreement between an employer and its employee.  Notably, the <u>Campbell</u> court relied extensively upon <u>Boughton</u>, which did not involve such a non-competition agreement.

Accordingly, this Court concludes that a non-statutory exemption to § 16600, for non-competition agreements which restrain an employee from only a small or limited part of a business or trade, does not exist under California law. Therefore, this Court concludes that the non-competition agreement into which Schimmang entered with Market Scan is enforceable <u>only</u> if he engaged in the misappropriation of trade secrets. Whether the evidence raises a genuine issue of material fact on that issue is discussed below in the Court's discussion of the Defendants' Motions for Summary Judgment, as they relate Plaintiff's claim of misappropriation of trade secrets, its First Claim for Relief.

<u>2. R&R's Alleged Breach of the NDA</u>

Before addressing the parties' contentions pertaining to the merits of this aspect of Plaintiff's Second Claim for Relief, this Court must resolve their disagreement as to which state's substantive law must be applied to the Plaintiff's claim that R&R breached the NDA. Plaintiff notes that the NDA provides that it is to be governed by the substantive law of Ohio and argues that, therefore, this Court must apply Ohio law.[14]  R&R, in contrast, contends that this Court must

---

[14]The NDA provides that it "shall be governed by and construed in accordance with the laws of the State of Ohio, <u>without giving effect to its conflicts of laws</u>." <u>See</u> Plaintiff's Second Amended Complaint (Doc. #103) at Ex. B, p. 3 (emphasis added). Although one could argue that the concluding clause of that provision makes it unnecessary to engage in a choice-of-law analysis, Market Scan has not made such an argument. Therefore, the Court does not consider that question. Parenthetically, however, if it were necessary, this Court would, in the absence of binding authority to the contrary which it has not been able to locate, hold that the emphasized language is a nullity. Although parties to a contract are, within limitations, free to select the substantive law of the state that will be utilized to construe an agreement, they are not authorized to tell courts what that law is or

utilize the substantive law of California, because the application of Ohio law would violate California's strong public policy in favor of the free mobility of employees. See Doc. #108 at 16. In accordance with Klaxon, supra, this Court turns to Ohio's choice-of-law principles.

In Schulke Radio Products, Ltd. v. Midwestern Broadcasting Co., 6 Ohio St.3d 436, 453 N.E.2d 683 (1983), the Ohio Supreme Court adopted the use of § 187 of the Restatement, Second, Conflict of Laws to resolve the question of whether to apply the law of the state chosen by the parties in their contract to settle disputes arising thereunder. Id. at 438-39, 453 N.E.2d at 686. The Schulke court held in the syllabus, which tracks the language of § 187:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.

Id. at 436, 453 N.E.2d at 684. Herein, as an initial matter, it is not at all clear that applying the non-solicitation provision will violate California's fundamental public policy. In support of that assertion, R&R has relied upon Scott v. Snelling & Snelling, Inc., 732 F. Supp. 1034, 1042 (N.D.Cal 1990),[15] Application Group, Inc. v. Hunter Group, Inc., 61 Cal. App.4th 881, 72 Cal. Rptr.2d 73 (1993) and Diodes, Inc. v. Franzen, 260 Cal. App.2d 244, 67 Cal. Rptr. 19 (1968). None of

_____

how to construe or to apply it. Under settled law (Klaxon, supra), this Court is required to apply Ohio's choice-of-law principles.

[15]In Scott, the court was applying California law.

those cases, however, held that California's public policy in favor of the freedom of movement of employees voids a voluntary non-solicitation provision in an agreement between two competitors. Although no decision of a California state court addressing that question could be located,[16] the Ninth Circuit held, in an unreported decision, that even though non-compete agreements are unenforceable under California law, that law does not void such a voluntary agreement between competitors. In re Ingle Co., Inc., 1997 WL 1485 (9th Cir. 1997). Nevertheless, this Court assumes for present purposes that such a non-solicitation agreement violates that public policy.

Assuming that California law would be applicable in the absence of the parties' voluntary agreement that Ohio law would govern their contract, California law does not have a greater material interest in the non-solicitation clause than does Ohio. On the contrary, those two states share the same or similar interests. The NDA is an agreement between one Ohio and one California corporation. Although there is no indication as to where that contract was negotiated, it is safe to say that it was anticipated that R&R would perform the non-solicitation provision primarily in the state of Ohio, where it is located and, from where it would contact Market Scan's employees. Indeed, Siddapur initially contacted Schimmang while she was located in Dayton, Ohio.

---

[16]Under § 16600, California courts have routinely voided anti-solicitation provisions in employment contracts, whereby a former employee is prohibited from soliciting his former employer's customers. Alliance Payment Systems, supra, 152 Cal App.4th at 634, 61 Cal. Rptr.3d at 801 (and cases cited therein). However, none of those decisions addressed the issue presented herein, i.e., whether a provision in an agreement between competitors, which prohibits them from soliciting each other's employees, is contrary to California's fundamental public policy.

Accordingly, the Court concludes that it must give effect to the parties'
mutual, voluntary decision that disputes arising under the NDA would be resolved
through the application of Ohio law.

The Plaintiff's breach of contract claim against R&R is comprised of two
aspects, to wit: 1) that R&R violated the NDA by soliciting Schimmang's
employment; and 2) that R&R breached that contract by retaining materials it
obtained from Market Scan during the due diligence process.  R&R argues that it is
entitled to summary judgment on both aspects of this claim.  As a means of
analysis, the Court discusses the parties' arguments in support of and in opposition
to summary judgment on the two aspects of this claim in the above order.


<u>First</u>, the NDA provides, in pertinent part:

> 6.  <u>Non-Solicitation</u>.  Prior to the first (1st) anniversary of the date of
> this Agreement, neither Party nor its subsidiaries or affiliates will solicit for
> employment or hire any employee of the other Party who is directly related
> to the services rendered under this Agreement without the prior written
> consent of the Party.  The immediately preceding sentence shall not prohibit
> (a) any general solicitation not directed specifically to such employees (and
> any hirings as a result) or (b) any Party or its subsidiaries or its affiliates from
> employing any person who contacts the Party or its subsidiaries or affiliates
> on his or her own initiative without any direct or indirect solicitation by the
> other Party or its subsidiaries or affiliates.

Plaintiff's Second Amended Complaint (Doc. #103) at Ex. B, p. 3.  Given that
Schimmang was involved in the due diligence process on behalf of Market Scan,
this Court concludes that the evidence raises a genuine issue of material fact as to
whether he was directly related to the services rendered under the NDA and that,
therefore, he comes within the coverage of the non-solicitation provision in that
contract.  Moreover, since the parties entered into the NDA on August 29, 2005,

the prohibition set forth in the non-solicitation provision expired on August 29, 2006, slightly more than one month after R&R had hired Schimmang, the prohibition set forth therein remained in effect when the hiring occurred.

R&R argues that it is entitled to summary judgment on the aspect of this claim arising out of the non-solicitation provision, because the evidence fails to raise a genuine issue of material fact as to whether it solicited Schimmang.  The uncontroverted evidence establishes that an employee of R&R in its Duluth, Georgia, facility unexpectedly resigned in February, 2006.  After Siddapur had unsuccessfully attempted to fill the position, Morris suggested that she contact Schimmang, as a resource for the purpose of obtaining names of individuals who might be interested in the position.[17]  Siddapur contacted Schimmang on March 30, 2006.  Unexpectedly, he indicted to Siddapur that he would be interested in the position.  Siddapur, who was not aware of either project Boron or the NDA, asked him a few background questions and requested that he send her his resume.  Siddapur shared his resume his resume with Poynter, who also had not been involved in Project Boron.  Siddapur also informed Morris of Schimmang's interest by email.  In addition, thinking that Morris had recommended him for the position, Schimmang sent him a thank you note by email.  Knowing that the NDA prohibited R&R from hiring Schimmang, Morris informed Poynter and Siddapur on April 6, 2006, that Schimmang could not be considered for the opening.  Schimmang was notified of that fact and all contact between him and R&R ceased.  Thereafter, R&R continued its unsuccessful efforts to fill the open position in Duluth.

---

[17]Morris provided the name to Siddapur of another individual, who was not employed by Market Scan, as a possible resource.

On May 16, 2006, Schimmang delivered a resignation letter to Market Scan, indicating that it would be effective the following June 5th.  On May 22, 2006, Schimmang sent an email to Siddapur, enclosing a copy of his resignation letter and indicating that he planned apply for the position in Duluth after his last day of employment with Market Scan.  After Schimmang's employment with Plaintiff had come to an end, Poynter conducted a telephone interview with him on June 16, 2006, and interviewed him in person one week later in Duluth.

As an initial matter, it bears emphasis that the non-solicitation provision contained in the NDA prohibited R&R from soliciting Market Scan's employees. That contract does not purport to prevent R&R from hiring Plaintiff's <u>former</u> employees.  Therefore, assuming for sake of argument that R&R solicited Schimmang after he had terminated his employment with Market Scan, that solicitation did not violate the non-solicitation provision contained in the NDA.

Accordingly, this Court focuses upon the question of whether R&R solicited Schimmang between March 30th, when Siddapur contacted him, and April 6th, when Morris told Siddapur that R&R could not employ him.  To resolve that question, the Court initially focuses upon the meaning of what the non-solicitation provision prohibited, to wit: that R&R will not "solicit for employment any employee" of Market Scan.  Under Ohio law, "contract terms are to be given their plain and ordinary meaning."  <u>City of Sharonville v. American Employees Ins. Co.</u>, 109 Ohio St.3d 186, 188, 846 N.E.2d 833, 836 (1999) (citing <u>Gomolka v. State Auto. Mut. Ins. Co.</u>, 70 Ohio St.2d 166, 167-168, 436 N.E.2d 1347, 1348 (1982)).  The term "to solicit" is defined as "to entreat or petition (a person) for, or to do, something; to urge, importune; to ask earnestly or persistently."  <u>See</u>

http://dictionary.oed.com (last visited July 26, 2007).  See also, Webster's Third International Dictionary at 2169 (defining solicit as "to make petition, to entreat [or to] importune").

The uncontroverted evidence before the Court does not raise a genuine issue of material fact as to whether Siddapur petitioned or entreated Schimmang to become an employee of R&R, during her interactions with him between March 30th and April 6th.  On the contrary, she contacted Schimmang with the intention of using him as a resource for names who might be able to provide the names of individuals whom R&R could contact to fill the vacant position.  Indeed, if there was any solicitation, it was Schimmang petitioning and entreating R&R to hire him. Nevertheless, Market Scan argues that the evidence raises a genuine issue of material fact as to whether R&R solicited Schimmang, given that he expressed his appreciation to Morris, by email, thinking that he (Morris) had recommended him for the position.[18]  This Court does not agree.  The uncontroverted evidence establishes that Siddapur contacted Schimmang for the purpose of using him as a resource, that, between March 30th and April 6th, neither she nor anyone else from R&R petitioned or entreated him to become an employee of R&R and that, once Morris—an individual with knowledge of the NDA—learned about the contacts with Schimmang, he brought those contacts to an immediate end.

---

[18]Plaintiff terms this to be an indirect solicitation, arguing that the non-solicitation provision expressly prohibits both direct and indirect solicitations.  This Court is unable to agree with the Plaintiff's interpretation of the document.  The mention of direct and indirect solicitation is contained in the second exception to the prohibition set forth in the first sentence of that provision, which excepts employing an employee of Market Scan who contacted R&R on his own initiative without direct or indirect solicitation by R&R.

Accordingly, the Court concludes that the evidence fails to raise a genuine issue of material fact concerning the question of whether R&R solicited Schimmang's employment in violation of the non-solicitation provision in the NDA.[19]

Second, turning to the aspect of this claim against R&R predicated upon its retention of certain materials after the due diligence had concluded, at the termination of that contract due to the failure of merger negotiations, R&R was required by the NDA either to return or to destroy the confidential information it had received from Market Scan, at the election of the latter.  At the conclusion of the due diligence process, R&R destroyed thousands of documents that had been provided to it.  However, it is not questioned that R&R retained certain materials. One document is comprised of a non-confidential list of the contact information, i.e., telephone numbers and email addresses, for the members of the due diligence teams for both R&R and Plaintiff, and a power point slide show, captioned "Project Boron," which contained preliminary due diligence information pertaining to Market Scan.  See II Morris Dep. at 189-91.  The other document was authored by Robert Taylor, one of the R&R members of its due diligence team, and sets forth his findings from the due diligence process.  See I Taylor Dep. at 58-60.

_____

[19]Parenthetically, even if the Court had concluded that the evidence raised such a genuine issue of material fact, it would have nevertheless held that R&R was entitled to summary judgment on this aspect of Plaintiff's breach of contract claim, because R&R's solicitation of Schimmang would have been part of a general solicitation, seeking to fill its open position in Duluth, not directed specifically to him.

According to R&R, it is entitled to summary judgment on this aspect of Plaintiff's breach of contract claim against it, because the Defendant did not suffer any harm as a result of the retention of those documents. This Court agrees. In order to prevail on a breach of contract claim under Ohio law, a plaintiff must establish, inter alia, that it has suffered damages as a result of the alleged breach. Gore v. Kamal, 2007 WL 755362 (Ohio App. 2007); Powell v. Grant Med. Ctr., 148 Ohio App.3d 1, 10, 771 N.E.2d 874, 881 (2002) (quoting Nilavar v. Osborn, 137 Ohio App.3d 469, 483, 738 N.E.2d 1271, 1281 (2000)); Doner v. Snapp, 98 Ohio App.3d 597, 600-01, 649 N.E.2d 42, 44 (1994). Herein, there is no evidence tending to raise a genuine issue of material fact on the question of whether Plaintiff was in any manner harmed by the retention of the two documents in contravention of the of the NDA.

Accordingly, the Court sustains R&R's Motion for Summary Judgment (Doc. #108), as its relates to Plaintiff's breach of contract claim against it, part of the Second Claim for Relief in Plaintiff's Second Amended Complaint (Doc. #103).

B. Intentional Interference with Contractual Relations (Third Claim for Relief)

Like its breach of contract claim, this cause of action is in actuality comprised of two separate claims for relief. The Plaintiff contends that Schimmang intentionally interfered with the non-solicitation provision of the NDA, as a result of being solicited by R&R. In addition, Market Scan asserts that R&R intentionally interfered with the non-competition agreement between itself (Plaintiff) and Schimmang. As a means of analysis, the Court will initially review

the legal standards which govern a claim of intentional interference with contractual relations, following which it will turn to the parties' arguments in support of and in opposition to the two Plaintiff's two such claims.

In Sole Energy Co. v. Petrominerals Corp., 128 Cal. App.4th 212, 26 Cal. Rptr.3d 798 (2005), the court reviewed the legal principles governing a claim of intentional interference with contractual relations under California law:

> The elements of a cause of action for interference with contractual relations are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages. (PMC, Inc. v. Saban Entertainment, Inc. (1996) 45 Cal. App.4th 579, 595, 52 Cal. Rptr.2d 877.)  Proof [that] the interfering conduct was wrongful, independent from the interference itself, is not required to recover for interference with contractual relations. (LiMandri v. Judkins (1997) 52 Cal. App.4th 326, 343, 60 Cal. Rptr.2d 539.)

Id. at 237-38, 26 Cal. Rptr. at 817.

Above, the Court has concluded that, through its contacts with and hiring of Schimmang, R&R did not breach the non-solicitation provision contained in its NDA with Market Scan.  Therefore, Schimmang is entitled to summary judgment on this aspect of Plaintiff's Third Claim for Relief, given that Plaintiff cannot establish the element of actual breach of contract.  However, even if it could establish that element, Schimmang would nevertheless be entitled to summary judgment, because the evidence fails to raise a genuine issue of material fact concerning the question of whether he had knowledge of the NDA.  During his deposition, Schimmang testified that he had never seen the NDA.[20]  See Schimmang Dep. at

---

[20]As Plaintiff points out (see Doc. #116 at 32 n. 11), Schimmang was required to sign a non-disclosure agreement in connection with R&R's due diligence.

257.  Moreover, West testified during his deposition that he did not provide a copy of that contract to Schimmang.  See West Dep. at 544.  In addition, the Court rejects the Plaintiff's contention that Schimmang was aware of the non-solicitation provision in the NDA, given that R&R informed him of its existence.  While this Court agrees that R&R did so inform Schimmang, it cannot agree that such raises a genuine issue of material fact as to whether liability can be imposed upon Schimmang for intentional interference with contractual relations.  Schimmang learned about the non-solicitation provision contemporaneously with ceasing his discussions with R&R about employment, i.e., at the same time he was told he could not be considered and why.  He did not contact R&R again until after he had resigned his employment with Market Scan, and he did not resume his discussions with R&R, which led to his ultimate employment, until after his employment with Plaintiff had ended.  It bears emphasis that the non-solicitation provision only limited R&R's interaction with Market Scan's employees and not its former employees.

Accordingly, the Court sustains Schimmang's Motion for Summary Judgment (Doc. #109), as it relates to Plaintiff's claim of intentional interference with contractual relations, part of the Third Claim for Relief in its Second Amended Complaint (Doc. #103).

R&R argues that it entitled to summary judgment on Plaintiff's claim of intentional interference with contractual relations, given that the existence of a valid contract is an element of such a claim and, further, since the non-competition

_____

However, that contract did not refer or relate to the non-solicitation of Market Scan's employees by R&R.

agreement into which Schimmang entered with Plaintiff is invalid under California

law.  However, this Court has concluded above that the non-competition

agreement is valid under California law, if Schimmang engaged in the

misappropriation of Plaintiff's trade secrets.  Whether the evidence raises a genuine

issue of material fact on that issue is discussed below in the Court's discussion of

the Defendants' Motions for Summary Judgment, as they relate Plaintiff's claim of

misappropriation of trade secrets, its First Claim for Relief.


C.  Civil Conspiracy (Fourth Claim for Relief)

Under California law, a civil conspiracy "is not a cause of action, but a legal

doctrine that imposes liability on persons who, although not actually committing a

tort themselves, share with the immediate tortfeasors a common plan or design in

its perpetration."  Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th

503, 510-511, 28 Cal. Rptr.2d 475, 478, 869 P.2d 454, 457 (1994).  See also,

Moran v. Enders, 135 Cal. App.4th 952, 37 Cal. Rptr.3d 786 (2006).  In Applied

Equipment Corp., the California Supreme Court explained further:

> We have summarized the elements and significance of a civil
> conspiracy: "'The elements of an action for civil conspiracy are the formation
> and operation of the conspiracy and damage resulting to plaintiff from an act
> or acts done in furtherance of the common design.…  In such an action the
> major significance of the conspiracy lies in the fact that it renders each
> participant in the wrongful act responsible as a joint tortfeasor for all
> damages ensuing from the wrong, irrespective of whether or not he was a
> direct actor and regardless of the degree of his activity.'"

7 Cal.4th at 511, 28 Cal. Rptr.2d at 478, 869 P.2d at 457 (ellipses in original and

citations omitted).  Moreover, under California law, "[a]gents and employees of a

corporation cannot conspire with their corporate principal or employer where they

act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." Reynolds v. Bement, 36 Cal. App.3d 1075, 1090, 116 P.3d 1162, 1171 (2005) (internal quotation marks and citations omitted).

Applying those legal standards to the evidence before the Court, construed in the manner most favorable to the Plaintiff, causes it to conclude that the evidence does not raise a genuine issue of material fact on this claim.  Schimmang and R&R could not have conspired after he became its employee, since there is no evidence that he was working other than in his official capacity for his employer at that time.  Moreover, there is no evidence that a conspiracy between Schimmang and his employer was formed and in operation, before he became R&R's employee.

Accordingly, the Court sustains the Motions for Summary Judgment filed by R&R (Doc. #108) and Schimmang (Doc. #109), as they relate to Plaintiff's claim of civil conspiracy, the Fourth Claim for Relief in its Second Amended Complaint (Doc. #103).

D.  Unjust Enrichment (Fifth Claim for Relief)

With its Fifth Claim for Relief, Plaintiff sets forth a free-standing claim of unjust enrichment against both of the Defendants.  They move for summary judgment, arguing that such a claim does not exist under California law.[21]  In Nordberg v. Trilegiant Corp., 445 F. Supp.2d 1082 (N.D.Cal. 2006), the court discussed the existence of a claim for unjust enrichment under the law of that state:

─────────────────────

[21]No one has argued that the substantive law of any other state but California applies to this claim.

- 31 -

The state and the federal courts appear to be unclear whether in California a court may recognize a claim for "unjust enrichment" as a separate cause of action.  See McBride v. Boughton, 123 Cal. App.4th 379, 387, 20 Cal. Rptr.3d 115 (2004) ("unjust enrichment is not a cause of action or even a remedy, but rather a general principle underlying various legal doctrines and remedies"); Lauriedale Assocs., Ltd. v. Wilson, 7 Cal. App.4th 1439, 1448, 9 Cal. Rptr.2d 774 (1992) ("the phrase '[u]njust [e]nrichment' does not describe a theory of recovery, but an effect: the failure to make restitution under circumstances where it is equitable to do so"); Enreach Tech, Inc. v. Embedded Internet Solutions, 403 F. Supp.2d 968, 976 (N.D.Cal.2005) (Wilken, J.) (citing McBride, 123 Cal. App.4th at 387, 20 Cal. Rptr.3d 115) ("unjust enrichment is not a valid cause of action in California."); Cf. Hirsch v. Bank of America, 107 Cal. App.4th 708, 722, 132 Cal. Rptr.2d 220 (2003) (reversing the lower court's dismissal of plaintiff's unjust enrichment claim upon finding that appellants stated a valid cause of action for unjust enrichment); see also Ghirardo v. Antonioli, 14 Cal.4th 39, 43-44, 57 Cal. Rptr.2d 687, 924 P.2d 996 (1996); Villager Franchise Sys. v. Dhami, Dhami & Virk, CV-F-04- 6393, 2006 WL 224425, 2006 U.S. Dist. LEXIS 6114 (E.D.Cal. 2006) ("California law recognizes a cause of action for unjust enrichment") (citing Ghirardo v. Antonioli, 14 Cal.4th 39, 51, 57 Cal. Rptr.2d 687, 924 P.2d 996 (1996)); Gerlinger v. Amazon.Com, Inc., 311 F. Supp.2d 838, 856 (N.D.Cal. 2004) (Patel, J.) ("[u]nder California law, unjust enrichment is an action in quasi-contract") (citing Paracor Fin. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996)); Western Pac. R. Corp. v. Western Pac. R. Co., 206 F.2d 495, 498 (9th Cir. 1953) ("it is of course true that the California courts, in common with authorities generally, recognize a cause of action based on unjust enrichment").

Id. at 1100.

Herein, it is not necessary for this Court to resolve that split of authority, since District Courts sitting in California have uniformly held that claims for unjust enrichment and other torts, arising out of the same core of facts as claims for misappropriation of trade secrets, are preempted by § 3426.7 of the California Uniform Trade Secrets Act ("UTSA").  See AirDefense, Inc. v. AirTight Networks, Inc., 2006 WL 2092053 (N.D.Cal. 2006) (holding that a claim of unjust enrichment preempted by the California UTSA); Digital Envoy, Inc. v. Google, Inc.,

370 F. Supp.2d 1025, 1034-35 (N.D.Cal. 2005) (holding that claims of unfair competition and unjust enrichment were preempted by the California UTSA, because those claims were based on the "identical facts alleged in its claim for misappropriation of trade secrets"); Memry Corp. v. Kentucky Oil Technology, N.V., 2005 WL 1656877 (N.D.Cal. 2005) (holding that California UTSA preempts plaintiff's claims of unfair competition and unjust enrichment arising out of the same facts as a claim of misappropriation of trade secrets); Ernest Paper Products, Inc. v. Mobil Chemical Co., Inc., 1997 WL 33483520 (C.D.Cal. 1997) (holding that plaintiff's tort claims were preempted by the California UTSA, because those claims were predicated upon the same core of operative facts as its misappropriation of trade secrets claim).[22]  See also, Samsung Electronics America, Inc. v. Bilbruck, 2006 WL, 2006 WL 3012875 (Cal. Superior 2006) (applying Ernst Paper Products to conclude that plaintiff's claim of unjust enrichment was preempted by the California UTSA).

This Court finds those decisions to constitute proper applications of the California UTSA.  Section 3426.7 provides:

§ 3426.7.  Effect of title on other statutes or remedies
(a) Except as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets.
(b) This title does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon misappropriation of a trade secret, or (3) criminal remedies, whether or not based upon misappropriation of a trade secret.

_____

[22]In none of those decisions did the court address the question of whether a freestanding claim of unjust enrichment exists under California law.

The negative implication of § 3426.7(b)(2), which provides that "other civil remedies that are not based upon misappropriation of a trade secret" are not affected by the California UTSA, is that other civil remedies that are based upon the misappropriation of a trade secret <u>are</u> preempted by that statute.[23]  Moreover, it bears emphasis that unjust enrichment is one of the available remedies under the California UTSA, for a claim of misappropriation of trade secrets.  <u>See</u> § 3426.3(a).[24]

Based upon the foregoing, this Court concludes that a claim for unjust enrichment, which arises out of the same facts as one for misappropriation of trade secrets, is preempted by § 3436.7 of the California UTSA.  Herein, Plaintiff's claim of unjust enrichment arises out of the alleged misappropriation of trade secrets. Indeed, Market Scan has opposed the Defendants' requests for summary judgment on this claim by pointing out that unjust enrichment is an available remedy under the UTSA, thus at least implicitly conceding that its claim for unjust enrichment stems from the alleged misappropriation of trade secrets.  <u>See</u> Doc. #116 at 40. Of course the remedy for unjust enrichment, contained in § 3426.3(a), remains available to Plaintiff, as a means of ascertaining non-actual damages.  <u>See</u> Footnote 24, <u>supra</u>.

––––––––––––––––––––

[23]California courts have employed the rule of negative implication to interpret statutes.  <u>See</u> <u>e.g.</u>, <u>Songstad v. Superior Court</u>, 93 Cal. App.4th 1202, 1208, 113 Cal. Rptr.2d 729, 734 (2001).

[24]Section 3426.3(a) provides:
> (a) A complainant may recover damages for the actual loss caused by misappropriation.  A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

Accordingly, the Court sustains the Motions for Summary Judgment filed by R&R (Doc. #108) and Schimmang (Doc. #109), as those motions relate to Plaintiff's freestanding claim of unjust enrichment, the Fifth Claim for Relief in its Second Amended Complaint (Doc. #103). Whether the Plaintiff will be able to recover for unjust enrichment as a remedy for its claim of misappropriation of trade secrets depends, in part, upon whether the Defendants are entitled to summary judgment on that claim, an issue which is discussed below.

E.  Breach of Fiduciary Duty (Sixth Claim for Relief)

As is indicated above, the Plaintiff has asserted its claim for breach of fiduciary duty, the Sixth Claim for Relief in its Second Amended Complaint (Doc. #103), against Schimmang alone. Given that this claim is based upon the alleged misappropriation of trade secrets by Schimmang, whether he is entitled to summary judgment on this claim depends upon the Court's ruling below on his request for summary judgment on Plaintiff's claim of misappropriation of trade secrets.

F.  Misappropriation of Trade Secrets (First Claim for Relief)

As is indicated above, the substantive law of California must be applied to resolve this claim. In 1984, California adopted the Uniform Trade Secrets Act, with minor alterations. See Cal. Civil Code § 3426, et seq.; Cadence Design Sys., Inc. v. Avant! Corp., 29 Cal.4th 215, 221, 57 P.3d 647, 650 (2002). A claim for misappropriation of a trade secret under California law includes two broad elements, to wit: 1) the existence of a trade secret and 2) the misappropriation of that trade secret. See e.g., Memry Corp. v. Kentucky Oil Technology, Inc., 2006

WL 3734384 (N.D.Cal. 2006) (applying California law); Dealertrack, Inc. v. Huber,

460 F. Supp.2d 1177, 1183 (C.D.Cal. 2006) (same).  A trade secret is not

misappropriated, unless improper means are utilized.  Cal Civil Code § 3426.1(b);

Cadence Design, 29 Cal.4th, at 222, 57 P.3d at 651.  See also Cal Civ Code

§ 3426.1(a) (defining "improper means").

 Defendants argue that they are entitled to summary judgment on this claim,

because Plaintiff has not submitted evidence to raise a genuine issue of material

fact on the question of the existence of the trade secrets allegedly

misappropriated, given that it has failed to identify those alleged trade secrets with

sufficient particularity.  Defendants also contend that, even if Plaintiff has met its

obligation in that regard, that which it claims to be trade secrets are matters of

general knowledge and, therefore, in the public domain and not trade secrets under

California law.[25]  As a means of analysis, the Court will initially review the legal

standards that it must apply to resolve Defendants' propositions, following which it

will turn to the parties' arguments in support of and in opposition to the

Defendants' arguments in that regard.

_____

[25]Defendants also argue that the evidence does not raise a genuine issue of
material fact concerning the question of whether they misappropriated the
materials Plaintiff claims to be trade secrets.  Construing the evidence in the
manner most favorable to the Plaintiff, the party against which summary judgment
has been sought, the Court concludes that the evidence raises such a genuine
issue of material fact and that, therefore, Defendants are not entitled to summary
judgment on that basis.  For instance, during a dinner of R&R's due diligence team,
after they had learned about Plaintiff's rates and residuals product, it
was suggested for the first time that it would be easy for R&R to build the product
itself.  In addition, Stephen Swope, a former employee of R&R who had worked on
the rates and residuals product after the termination of the NDA, stated in his
affidavit that R&R used a competitor's technology to construct its new product.
When Schimmang began his employment with R&R in July, 2006, Poynter
indicated that R&R was fortunate to have him as an employee, because of his
experience of and knowledge with rates and residuals.

The term "trade secret" is defined by § 3426.1(d) of the California UTSA, which provides:

> (d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Courts have held that, under California law, the party asserting a claim of misappropriation of trade secrets must identify them with sufficient particularity. For instance, in Imax Corporation v. Cinema Technologies, Inc., 152 F.3d 1161 (9th Cir. 1998), the plaintiff alleged, inter alia, that the defendant had misappropriated its trade secrets in the large format motion picture projectors, also known as rolling loop projectors, it (Plaintiff) had developed. The District Court granted summary judgment in favor defendant, because the plaintiff had failed to describe its trade secrets with particularity. The plaintiff appealed, and the Ninth Circuit affirmed, applying the California UTSA. That court initially reviewed the legal obligation imposed upon a plaintiff, requiring that it describe the allegedly misappropriated trade secrets with specificity:

> A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993). The plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." Universal Analytics v. MacNeal-Schwendler Corp., 707 F. Supp. 1170, 1177 (C.D.Cal. 1989) (citation omitted) (emphasis added), aff'd 914 F.2d 1256 (9th Cir. 1990).

Id. at 1164-65 (ellipses in the original).  Notably, California courts have adopted

the same standard regarding a plaintiff's obligation of describing trade secrets.  See

e.g., Whyte v. Schlage Lock Co., supra, 101 Cal. App.4th at 1453, 125 Cal.

Rptr.2d at 286.[26]  In Imax, after protracted disputes in the District Court

concerning the plaintiff's obligation to describe the allegedly misappropriated trade

secrets, it listed 80, four of which were listed by the Ninth Circuit:

> Imax believes that CTI has misappropriated all or part of the following Imax
> trade secrets embodied in Imax's . . . projector system:
>
> * * *
>
> bb. the design of the cam unit, including every dimension and tolerance that
> defines or reflects that design;
>
> * * *
>
> bd. the manner of operation of the cam unit;
>
> be. the manner in which the cam unit is lubricated;
>
> bf. the design of the film arms, including every dimension and tolerance that
> defines or reflects that design;

---

[26]In one of the decisions quoted by the Ninth Circuit in Imax, MAI Sys. Corp. v.
Peak Computer, Inc., 991 F.2d 511 (9th Cir. 1993), the court made the quoted
statement in the context of ruling on a claim of misappropriation of trade secrets
under the California UTSA.  In the other, Universal Analytics, Inc. v. MacNeal-
Schwendler Corp., 707 F. Supp. 1170 (C.D.Cal. 1989), aff'd 914 F.2d 1256 (9th
Cir. 1990), the plaintiff claimed that the defendant had violated antitrust laws by
maintaining or attempting to maintain a monopoly.  In support of that claim,
plaintiff contended that defendant had engaged in the predatory practice of
misappropriating its trade secrets.  The Universal Analytics court supported the
portion of its decision that the Ninth Circuit quoted with California law.

- 38 -

Id. at 1166 (emphasis added by the Ninth Circuit).  The Ninth Circuit concluded

that the plaintiff had failed to describe its trade secrets with the requisite degree of

particularity, writing:

> We further note that because Imax's trade secrets claim involves a
> sophisticated and highly complex projector system, it is unlikely that the
> district court or any trier of fact would have expertise in discerning exactly
> which of the projector system's many "dimensions and tolerances" were
> trade secrets. Moreover, [defendant] could not be expected to prepare its
> rebuttal to Imax's trade secrets claim without some concrete identification of
> exactly which "dimensions and tolerances" Imax alleged were incorporated
> into [defendant's] own projector system.
>
> We therefore hold that Imax's Fourth Supplemental Responses failed
> to indicate precisely which dimensions and tolerances were trade secrets.
> Under these facts, reasonable specificity could only be achieved by
> identifying the precise numerical dimensions and tolerances as trade secrets.

Id. at 1167.

In MAI Computer Corp. v. Peak Computer, Inc., 991 F.2d 511 (9th Cir.

1993), the District Court had granted summary judgment and issued a preliminary

injunction in favor of plaintiff, inter alia, enjoining the defendant from using the

plaintiff's diagnostic software.  The Ninth Circuit reversed and remanded, writing:

> We recognize that computer software can qualify for trade secret
> protection under the UTSA.  See e.g., S.O.S., Inc. v. Payday, Inc., 886 F.2d
> 1081, 1089-90 (9th Cir. 1989).  However, a plaintiff who seeks relief for
> misappropriation of trade secrets must identify the trade secrets and carry
> the burden of showing that they exist.  Diodes, Inc. v. Franzen, 260 Cal.
> App.2d 244, 67 Cal. Rptr. 19, 22-24 (1968); see also Universal Analytics
> Inc. v. MacNeal-Schwendler Corp., 707 F. Supp. 1170, 1177 (C.D.Cal.
> 1989) (plaintiff failed to inform defendant or the court "precisely which trade
> secret it alleges was misappropriated"), aff'd, 914 F.2d 1256 (9th Cir.
> 1990).
>
> Here, while MAI asserts that it has trade secrets in its diagnostic
> software and operating system, and that its licensing agreements constitute
> reasonable efforts to maintain their secrecy, MAI does not specifically
> identify these trade secrets.  In his Declaration, Joseph Perez, a Customer
> Service Manager at MAI, stated that the diagnostic software "contain
> valuable trade secrets of MAI," however, the Declaration does not specify

what these trade secrets are. Additionally, we find no declaration or deposition testimony which specifically identifies any trade secrets. Since the trade secrets are not specifically identified, we cannot determine whether Peak has misappropriated any trade secrets by running the MAI operating software and/or diagnostic software in maintaining MAI systems for its customers, and we reverse the district court's grant of summary judgment in favor of MAI on its claim that Peak misappropriated trade secrets in its computer software and vacate the permanent injunction as it relates to this issue.

Id. at 522-23.

In IDX Systems Corp. v. Epic Systems Corp., 285 F.3d 581 (7th Cir. 2002), the Seventh Circuit addressed the question of whether the plaintiff had sufficiently identified the allegedly misappropriated trade secrets in an action arising under the Wisconsin version of the UTSA, which does not materially differ from California's. Therein, the plaintiff and a defendant both manufactured software utilized in the financial side of the practice of medicine, i.e., for billing, insurance reimbursement and other collections. The plaintiff alleged that two of that defendant's former employees had gone to work for a large medical practice that had previously used its (plaintiff's) software.[27] According to the plaintiff, the defendant's former employees had caused the medical practice to utilize the defendant's software and had provided plaintiff's trade secrets to their former employer. The District Court granted summary judgment and the Seventh Circuit affirmed, concluding that the plaintiff had failed to "pin down" the alleged trade secrets, writing:

According to IDX, "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is specific enough. No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the

_____

[27]The former employees and their new employer were also defendants.

> trade, and which are not?  That's vital under the statutory definition.
> Likewise, IDX's tender of the complete documentation for the software
> leaves mysterious exactly which pieces of information are the trade secrets.
> As we remarked in <u>Composite Marine Propellers, Inc. v. Van Der Woude</u>,
> 962 F.2d 1263, 1266 (7th Cir. 1992), a plaintiff must do more than just
> identify a kind of technology and then invite the court to hunt through the
> details in search of items meeting the statutory definition.  <u>See</u> <u>also</u> <u>AMP</u>
> <u>Inc. v. Fleischhacker</u>, 823 F.2d 1199, 1203 (7th Cir. 1987).

<u>Id</u>. at 583-84.

The Plaintiff's claim of misappropriation of trade secrets is predicated upon

two classes of trade secrets which the Defendants are alleged to have

misappropriated.  The first of those classes is comprised of the trade secrets which

R&R is alleged to have misappropriated during the due diligence process, as

supplemented by Schimmang after his employment with that Co-Defendant had

commenced.  The second class is comprised of the materials that Schimmang

emailed to himself, after he had resigned but before his employment with Market

Scan had terminated.  As indicated, in their Motions for Summary Judgment

(Docs. ##108 and 109), the Defendants argue that they are entitled to summary

judgment on Plaintiff's claim of misappropriation of trade secrets, because Plaintiff

has failed to identify with sufficient particularity the trade secrets that they are

alleged to have misappropriated, and given that, even if Plaintiff has met its

obligation in that regard, its claimed trade secrets are matters of general knowledge

and not trade secrets under California law.  As a means of analysis, the Court will

initially discuss the parties' arguments pertaining the first class of trade secrets,

following which it will turn to their contentions concerning the materials

Schimmang emailed to himself.

In its Memorandum in Opposition (Doc. #116), the Plaintiff attempted in a

number of locations therein to meet its obligation to describe its trade secrets,

which were allegedly misappropriated by R&R during the due diligence process,

with sufficient particularity.  Initially, Plaintiff stated:

> 4.  The trade secrets at issue involve the architecture and design by which rates and residuals are processed.  While both Market Scan and [R&R] receive the rates and residuals sheets from similar and in some cases, identical sources, the [] entities['] similarities end there.  Market Scan "explodes" or "twists" its information via an automated mechanism to populate a comprehensive database of financing options.  [R&R], on the other hand, prior to its misappropriation of Market Scan's design and architecture of its utilities and processes, was required to input the information manually. (Taylor Depo., pp. 271-273; App. 5).

> 5.  Market Scan takes a single rate sheet that it receives from a lending institution and "explodes" the information to generate hundreds of thousands of rates for the lending institutions' programs.  Market Scan's trade secrets, which have since been misappropriated, are identified and fully explained in [R&R's] own documents, culminate in an automated process that produces a more efficient, cost-effective, and accurate rates and residual[s] data base that is scalable.  (Webster Depo., pp. 60-61; App. 6; PX. 125; App. 4).

Doc. #116 at 2.  None of the materials cited by the Plaintiff in those two

paragraphs add flesh to Plaintiff's description of its trade secrets.[28]  Next, Plaintiff

indicates that detailed trade secret information pertaining to its technology and its

rates and residuals software was revealed to R&R during the due diligence,

including how it (Plaintiff) is able to propagate its rates and residuals data base, the

utilities it uses and how it enters, controls and utilizes data and its data structure.

Id. at 7.  Plaintiff cited various passages from West's deposition to support those

statements; however, none of the cited excerpts from West's deposition contains a

---

[28]By way of explanation, each of Plaintiff's citations to the record, such as particular pages from an individual's deposition, an exhibit or an affidavit, is followed by "App. __ ," which identifies the tab of Plaintiff's Appendix at which the item can be located.  Plaintiff submitted that Appendix as part of its Memorandum in Opposition (Doc. #116).

description of Market Scan's trade secrets.  In addition, Plaintiff states, without citation to the record, that R&R "has effectively stolen Market Scan's architecture and design of its twist utility (automated rate explosion) and related processes that it learned in due diligence." Id. at 11.  See also, Id. at 12 (without citation to the record, stating that, during the due diligence process, R&R misappropriated and is implementing Market Scan's "processes, architecture and designs").  Plaintiff also states that the design and architecture of its proprietary software application is its trade secret.[29] Id. at 20.  See also, Id. at 21 (stating, without citation to the record, that the evidence establishes that R&R "at least misappropriated Market Scan's design and architecture for its rates and residuals software").

R&R argues in its Reply Memorandum (Doc. #127) that the Plaintiff has not met its obligation to describe with sufficient particularity the subject matter of the trade secrets, R&R is alleged to have misappropriated during the due diligence process.  This Court agrees.  According to the foregoing descriptions, R&R is alleged to have misappropriated Plaintiff's design and architecture to its software, its technology pertaining to its software, its design of the utility that "twists" or "explodes" data, the utilities it uses and how it enters, controls and utilizes data and its data structure.  Notably missing from that Plaintiff's discussion of the allegedly misappropriated trade secrets is, for instance, a description of the design and architecture of Plaintiff's software or how design utility "twists" or "explodes

---

[29]In support of that assertion, Plaintiff cites, inter alia, a portion of the first report by its software expert, Bruce Webster, in which he states that he's not seen anything like Market Scan's approach in more than 30 years of software engineering.  He did not otherwise describe that software, other than by identifying the key concept as having a relatively small number of data files and by templates that are then "twisted" or "exploded" into a full population of the required data.  In the cited passage from his report, Webster did not explain how the files and templates are "twisted" or "exploded."

the data."[30]  Thus, after the filing of R&R's Reply Memorandum (Doc. #127), this dispute appeared strikingly similar to the decisions discussed above.  Just as the failure to provide the dimensions and tolerances in Imax, or describe with particularity the software in MAI and IDX had been fatal, Plaintiff's conclusory description of its trade secrets herein causes this Court to conclude that Plaintiff had not met its obligation of describing the allegedly misappropriated trade secrets with sufficient particularity.[31]

Stated somewhat differently, the Plaintiff has described the results its alleged trade secrets are intended to accomplish, without an explanation of how those results will be achieved.  The decisions discussed above by this Court all turn on the concept that an explanation of how a trade secret will achieve its intended result is essential to describing it with particularity, even though that concept was not expressly so stated.  For instance, in Imax, supra, the plaintiff had declined to identify any of the dimensions and tolerances of which its trade secrets were allegedly comprised, thus failing to disclose the manner in which those alleged trade secrets achieved their intended results.  In MAI, supra, the plaintiff essentially described what its alleged trade secrets were intended to accomplish, by describing

_____

[30]R&R points out in its Reply Memorandum that West and Webster testified during their depositions that Market Scan's "twist" is performed using Microsoft's Excel program.  See Doc. #127 at 12.  Plaintiff has not claimed a trade secret in that computer program.

[31]Plaintiff also argued that the compilation or combination of these components constituted its trade secret.  See Plaintiff's Memorandum in Opposition (Doc. #116) at 23.  While this Court agrees with Plaintiff that under California law a combination or compilation can constitute a trade secret (see § 3426.1(d)), the Plaintiff has not met its burden of describing such a trade secret with sufficient particularity, given its failure to describe its constituent parts with such particularity.

them as diagnostic software and an operating system.  What was missing was a description of how those trade secrets would achieve the intended results of diagnosis and operation.  In IDX, without an explanation of the software, upon which its claim of misappropriation was based, it was not possible to ascertain how that software would be able to accomplish its intended result.

Perhaps sensing that shortcoming, Plaintiff, in response to R&R's Reply Memorandum (Doc. #127), has filed a Sur-Reply Memorandum (Doc. #129), to which it appended the second report of Bruce Webster ("Webster"), its software expert.[32]  In ¶ 56 of that document, Webster contains what appears to be his description of Market Scan's trade secrets:[33]

> I. Mimic the rate sheet presentation.  As far as possible, make the data entry tool on the computer look like the rate sheet itself in terms of how the rates and policy information are laid out.  This increases efficiency and timeliness (it is easier to see what data goes where), as well as accuracy (there is less chance of entering the wrong value in the wrong location).  This decision leads to:
>
> > A. Use a template-based approach.  For each rate sheet layout format, create a corresponding electronic rate sheet template (pre-formatted rate sheet) and simply make a copy of that template when you need a new rate sheet in that format, modifying it if necessary.  This leads to:
> >
> > > 1. Allow for creation of new templates.  New rate sheet layouts show up on a regular basis, so you have to be able to create new templates and/or modify old one as they do.  Likewise:

---

[32]Webster executed his second report on January 19, 2007, after the Defendants had filed their Motions for Summary Judgment (Docs. ##108 and 109) and the Plaintiff had filed its Memorandum in Opposition (Doc. #116).

[33]No other provision in that Report could be considered such a description.

2.  Allow multiple templates for each lender.  Many lenders don't have a single, standard format for their rate sheets, so you will have to be able to support having multiple rate sheet templates for each lender.

B.  Use a grid-based presentation.  Most rate sheets present the basic rate information as a table or grid with rows and columns.

II.  Minimize data entry.  In other words, reduce as far as possible the actual human work required to get the rate sheet updates into the Market Scan computer system.  This increases efficiency (fewer people are required to get the daily updates entered), timeliness (all the updates can be entered in each day), and accuracy (the fewer human operations required, the less chance for error).  This ties back to mimicking the rate sheet presentation, but also it leads to:

A.  Minimize rate sheet data entry.  This ties directly into the "mimic rate sheet presentation" goal above.  The idea is to have the human operator only enter in what is necessary in order to capture the changes reflected by the new rate sheet.  This leads to:

1.  Retain existing rate sheets.  Often, a new rate sheet that comes in from a given lender only changes a few of the values from the old sheet that it replaces.  Bringing up and modifying the old rate sheet, instead of re-entering the rate data into a new rate sheet, improves accuracy, efficiency, and timeliness.

B.  Minimize and retain other data entry.  Besides rate sheet updates, Market Scan must deal with extensive policy information about each lender (such as the maximum loan amount allowed), as well as residual values of cars and car components and information on automobile make, model and option confirmations.

C.  Substitute calculation for human interaction where possible.  Computers are vastly faster than humans at data manipulation, and (provided the software is written correctly) they are always accurate.  So whenever possible, allow the computer to generate data values from those entered by humans, including:

1.  Allow computers to do all interpolations.  Many of the rate sheets and residual information only lay out the points at which values change (for example, at 12 months, 24 months, and so on).  Allow the computer to apply calculations and rules to

determine intervening values (for example, lease rate and residual value for a 30-month lease).

2. <u>Allow computers to do exception and special case processing</u>.  Having entered lender-specific exception and special care information once, allow the computer to apply that information as needed.

3. <u>Allow computers to do all combinatorial calculations</u>.  For example, rate information from a given lender may apply to only certain classes, makes, models and even colors of automobiles, may apply only on certain days, may apply only in certain regions, and so on.  As far as possible, all such combinations should be done by the computer rather than by the human operator.

III.  <u>Delay calculation until after quality assurance of human data entry</u>.  Quality assurance of the human data entry should take place before most if not all of the computer calculations listed above.  This improves the efficiency and accuracy of the quality assurance effort because (a) the entered data still mimics the rate sheet layout, (b) there are fewer values to check, and (c) the resulting "explosion" of computer calculations vastly expands the amount of data to be delivered while maintaining the quality of the human-verified data.

Plaintiff's Sur-Reply Memorandum (Doc. #129) at Ex. A, pp 14-15 (paragraph numbering added).

In response thereto, R&R has filed a reply,[34] in which it continues to argue that it is entitled to summary judgment, because the second report from Webster has failed to identify with sufficient particularity the trade secrets that it is alleged to have misappropriated, and given that, even if Webster's second report established that Plaintiff has met its obligation in that regard, its claimed trade secrets are matters of general knowledge and not trade secrets under California law.  For reasons which follow, this Court agrees.

_____

[34]The Defendants were able to question Webster on his second report, during the second deposition, conducted on January 26, 2007, before R&R filed that reply.

As an initial matter, the Court has discussed above Plaintiff's failure to explain how its alleged trade secrets achieve the intended result of creating a more efficient, cost effective, timely and accurate rates and residuals product.  Simply stated, as discussed below, the quoted passage from Webster's second report does not raise a genuine issue of material fact as to whether Plaintiff has met that obligation.  Therefore, the Court concludes that the evidence fails to raise a genuine issue of material fact as to whether Plaintiff has identified its alleged trade secrets with sufficient particularity.

The Court need not spend a great deal of time on above-quoted ¶ III.  Even if that paragraph describes Plaintiff's trade secrets with sufficient particularity, the information contained therein is known to the general public, given that it merely indicates that efficiency and accuracy are enhanced by conducting quality control assurance on the inputted data, before computations with that data.  Indeed, ¶ III is a description of Market Scan's use of the adage "measure twice, cut once."  In addition, in ¶ II(C), Webster merely indicates that a computer should be used to compute, because computers are better than humans at that task.  That information is generally known to the public.  Therefore, Defendant's alleged misappropriation in this regard is not actionable, even if the information set forth in ¶ II(C) were deemed to describe Plaintiff's trade secrets with sufficient particularity.[35]

---

[35]In ReadyLink Healthcare v. Cotton, 126 Cal. App. 4th 1006, 1020, 24 Cal Rptr.3d 720, 729 (2006), the court held that information known to the public may nevertheless be granted trade secret protection, if it was procured with substantial effort.  There is no indicated that Market Scan expended significant effort discovering that efficiency and accuracy are improved by delaying the use of data inputted by people until after quality assurance has been conducted or by using computers to compute, rather than humans.

The remaining information contained in the other parts of the quoted portion of Webster's second report, i.e.,that set forth in ¶¶ I, II(A) and (B), relates to the use and retention of templates.[36]  This Court will assume for present purposes that this portion of Webster second report meets Plaintiff's burden of describing its trade secrets in templates with sufficient particularity,[37] the use of templates in the manner used by Plaintiff in its rates and residuals product is well known.  For instance, during his deposition, Stephen Swope, a disgruntled former employee of R&R who had provided an affidavit to Plaintiff which it used to oppose his former employer's request for summary judgment, so testified.  In addition, U.S. Patent 6,574,314, issued to R&R in June, 2003, refers to the use of templates for data entry.  Moreover, in 2002, Microsoft offered users of Excel, the opportunity of downloading Template Wizard, which would ease the entry of data through templates.

Accordingly, the Court concludes that the Defendants are entitled to summary judgment on that aspect of Plaintiff's First Claim for Relief which is predicated upon the materials R&R allegedly misappropriated during the due diligence process, which Schimmang is alleged to have reinforced and further misappropriated after he became its employee.

With respect to the materials Schimmang emailed to himself before his employment with Market Scan ended, R&R set forth a table in its Motion for

---

[36]In ¶ II(B), Webster describes Plaintiff's trade secrets as using a grid based approach.  However, the grid originates in the Microsoft Excel program, which Plaintiff does not claim to be part of its trade secrets.

[37]Parenthetically, the Court notes that Webster has not indicated what information set forth in that report is generally known and what is not.  See IDX, supra, 285 F.3d at 584.

Summary Judgment, which identifies those materials and demonstrates that they were not trade secrets.  See Doc. #108 at 14-15.  In its Memorandum in Opposition, the Plaintiff argues that the materials Schimmang emailed to himself constitute trade secrets.  Doc. #116 at 3.  However, in that Memorandum, Plaintiff fails to describe with sufficient particularity the trade secrets which Schimmang allegedly misappropriated by sending himself the email.  Moreover, the passages from the depositions of West and Schimmang that Plaintiff has cited do not contain such a description, nor has Plaintiff addressed Schimmang's email in its Sur-Reply Memorandum (Doc. #129).  Accordingly, the Court concludes that the Defendants are entitled to summary judgment on the aspect of Plaintiff's First Claim for Relief which is predicated upon the materials Schimmang emailed to himself before he left his employment with Plaintiff.[38]

Accordingly, the Court sustains the Defendants' Motions for Summary Judgment (Docs. ##108 and 109), as they relate to Plaintiff's claim of misappropriation of trade secrets, the First Claim for Relief in its Second Amended Complaint (Doc. #103).  As a consequence, the Court also sustains Schimmang's Motion for Summary Judgment (Doc. #109), as it relates to Plaintiff's claims of breach of contract and fiduciary duty, part of the Second and the entire Sixth Claims for Relief in its Second Amended Complaint (Doc. #103).

---

[38]Given that conclusion, it is not necessary for the Court to consider the Defendants' alternative argument that those materials were not misappropriated, because the email was not accessed by Schimmang, who no longer possesses it.

Based upon the foregoing, the Court sustains the Defendants' Motions for Summary Judgment (Docs. ##108 and 109) in their entirety.[39]  As a result of the Court's rulings herein, Plaintiff's Motion for Order to Show Cause (Doc. #192), with which it requests that the Court find R&R to be in civil contempt, and R&R's Motion to Strike Plaintiff's Motion for Order to Show Cause or, in the alternative, to Disregard the Affidavit of Vincent Esposito (Doc. #204), remain to be resolved. Although the parties have briefed those motions extensively (see Docs. ##205, 208, 210 and 212), Plaintiff only filed the affidavit of Paul Mitchell in support of its motion on July 17, 2007.  See Doc. #250.  R&R has yet to file a response to same.  Therefore, putting aside Plaintiff's request that the Court order R&R to produce certain materials (see Doc. #192 at 3-4), resolution of Plaintiff's motion is not presently possible, even if an evidentiary hearing is not necessary to resolve same.  Nevertheless, for reasons which follow, this Court deems it proper to enter final judgment herein, in accordance with Rule 54(b) of the Federal Rules of Civil Procedure, in order to allow the Plaintiff to take an immediate appeal.

As an initial matter, this Court is of the opinion that, in the absence of certification in accordance with Rule 54(b), final judgment cannot be entered in this proceeding, until the Plaintiff's Motion for Order to Show Cause (Doc. #192) has been resolved with finality.  In Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990), the Supreme Court held that a court can impose sanctions under Rule 11,

---

[39]Given that ruling, it is not necessary for the Court to rule upon R&R's Motion for Partial Summary Judgment Regarding the Absence of Damages (Doc. #139) and Schimmang's Motion for Partial Summary Judgment on the Issue of Damages (Doc. #176), as well as Plaintiff's request to conduct additional discovery in order to respond to those motions.  See Doc. #184.  In addition, the Court need not rule upon the numerous Motions in Limine filed by the parties.  See Docs. ##82, 138, 144, 145, 146, 147, 162, 166, 168, 171 and 247.

even though the plaintiff had previously dismissed the action in accordance with Rule 41 of the Federal Rules of Civil Procedure.  In the course of that decision, the Cooter & Gell Court discussed other types of collateral issues that a court will resolve separately from the merits of litigation, after final judgment has been entered:

> It is well established that a federal court may consider collateral issues after an action is no longer pending.  For example, district courts may award costs after an action is dismissed for want of jurisdiction.  See 28 U.S.C. § 1919.  This Court has indicated that motions for costs or attorney's fees are "independent proceeding[s] supplemental to the original proceeding and not a request for a modification of the original decree."  Sprague v. Ticonic National Bank, 307 U.S. 161, 170 (1939).  Thus, even "years after the entry of a judgment on the merits" a federal court could consider an award of counsel fees.  White v. New Hampshire Dept. of Employment Security, 455 U.S. 445, 451, n. 13 (1982).  A criminal contempt charge is likewise "'a separate and independent proceeding at law'" that is not part of the original action.  Bray v. United States, 423 U.S. 73, 75 (1975), quoting Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 445 (1911).  A court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated.  See United States v. Mine Workers, 330 U.S. 258, 294 (1947) ("Violations of an order are punishable as criminal contempt even though … the basic action has become moot"); Gompers v. Buck's Stove & Range Co., supra, 221 U.S., at 451 (when main case was settled, action became moot, "of course without prejudice to the power and right of the court to punish for contempt by proper proceedings").  Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action.  Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate.  Such a determination may be made after the principal suit has been terminated.

Id. at 395-96 (emphasis added).  Two of the decisions addressing contempt proceedings cited by the Cooter & Gell court, Bray v. United States, 423 U.S. 73 (1975) and United States v. Mine Workers, 330 U.S. 258 (1947), arose out of criminal contempt proceedings.  Therefore, given that the Plaintiff has requested that the Court find R&R to be in civil rather than criminal contempt, those decisions

do not support the proposition that this Decision is separable from the contempt matter, permitting the entry of final judgment, without Rule 54(b) certification. Although the third decision cited in Cooter & Gell pertaining to contempt, Gompers v. Buck's Stove & Range Co., 221 U.S. 418 (1911), arose out of what the Supreme Court concluded was a civil contempt proceeding, Gompers supports this Court's conclusion that it cannot now enter final judgment. Therein the Supreme Court noted that civil and criminal contempt differed, in part, because "[p]roceedings for civil contempt are between the original parties, and are instituted and tried as a part of the main cause," while "proceedings at law for criminal contempt are between the public and the defendant, and are not a part of the original cause." Id. at 444-45. Thus, the Gompers Court concluded that the trial court had been without the authority to enter a finding of civil contempt, because the parties had previously settled the dispute. The Supreme Court did, however, suggest that the trial court could vindicate its authority through proceedings to hold Gompers and his fellow officers of the American Federation of Labor in criminal contempt. Moreover, although the imposition of civil contempt sanctions on a third-party is immediately appealable, finding a party in civil contempt is an interlocutory order and, therefore, not subject to an immediate appeal. OSRecovery, Inc. v. One Groupe Intern., Inc., 462 F.3d 87, 92 (2d Cir. 2006); In re Shalala, 996 F.2d 962, 964 (8th Cir. 1993). See also, Kirkland v. Legion Ins. Co., 343 F.3d 1135, 1140 (9th Cir. 2003) (holding that finding a party in criminal contempt is immediately appealable, while such a finding with regard to civil contempt is not); Reed v. Cleveland Bd. of Ed., 607 F.2d 749 (6th Cir. 1979) (holding that civil contempt adjudications, made after the entry of a final school

desegregation order, were final and appealable, since the adjudications arose out of post-order failure to act).

The foregoing authority causes this Court to conclude that a civil contempt proceeding is part of the underlying litigation and that, unlike a request for attorney's fees, costs and/or sanctions, the resolution of such a proceeding cannot be delayed until after final judgment has been entered.  Accordingly, in the absence of authority holding that a District Court can enter final judgment, while a request to find a party in civil contempt is pending, this Court concludes that it cannot enter final judgment herein, except in accordance with Rule 54(b), which provides:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties.  When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.  In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In General Acquisition, Inc. v. GenCorp., Inc., 23 F.3d 1022 (6th Cir. 1994), the Sixth Circuit discussed the standards which a District Court must apply, when a party requests that final judgment be entered pursuant to Rule 54(b):

> Rule 54(b) of the Federal Rules of Civil Procedure permits immediate review of certain district court orders prior to the ultimate disposition of a case.  See, e.g., Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 3 (1980); Liberty Mutual [v. Wetzel, 424 U.S. 737, 742-43 (1976)]; Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 435 (1956).  Although Rule 54(b) relaxes the traditional finality requirement for appellate review, it does not tolerate immediate appeal of every action taken by a district court.  The rule is specifically "designed to facilitate the entry of judgment on one or more

claims, or as to one or more parties, in a multi-claim/multi-party action." Solomon v. Aetna Life Ins. Co., 782 F.2d 58, 60 (6th Cir. 1986).

Rule 54(b) certification requires two independent findings. First, the district court must expressly "direct the entry of final judgment as to one or more but fewer than all the claims or parties" in a case. Second, the district court must "express[ly] determin[e] that there is no just reason" to delay appellate review. Fed.R.Civ.P. 54(b); WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2655 (1983 & Supp.1993) (hereinafter "Wright, Miller & Kane"). A district court certifying an order under Rule 54(b) must clearly explain why it has concluded that immediate review of the challenged ruling is desirable. Solomon, 782 F.2d at 61-62.

The first step in certification, entry of partial final judgment, is satisfied where some decision made by the district court ultimately disposes of one or more but fewer than all of the claims or parties in a multi-claim/multi-party action. As the Supreme Court explained in Curtiss-Wright:

A district court must first determine that it is dealing with a "final judgment." It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action."

446 U.S. at 7 (citing Sears, 351 U.S. at 436); Wright, Miller & Kane § 2656.

The second step in certification, determination of no just reason for delay, requires the district court to balance the needs of the parties against the interests of efficient case management. "Not all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims." Curtiss-Wright, 446 U.S. at 8. Courts implementing Rule 54(b) must "strike a balance between the undesirability of more than one appeal in a single action and the need for making review available in multiple-party or multiple-claim situations at a time that best serves the needs of the litigants." Wright, Miller & Kane § 2654. By limiting interlocutory appeals under Rule 54(b) to "infrequent harsh case[s]," Rudd Construction Equip. Co., Inc. v. Home Insurance Co., 711 F.2d 54, 56 (6th Cir. 1983), courts can alleviate hardship resulting from unnecessary delay without undermining "the historic federal policy against piecemeal appeals." Curtiss-Wright, 446 U.S. at 8 (citing Sears, 351 U.S. at 438).

Id. at 1026-27. See also, Lowery v. Federal Express Corp., 426 F.3d 817 (6th Cir.

2005) Good v. Ohio Edison Co., 104 F.3d 93, 95 (6th Cir. 1997).

First, it cannot be questioned that this Decision constitutes its ultimate, final disposition of the Plaintiff's claims against the Defendants, except for its "claim," requesting that the Court find R&R in civil contempt and, inter alia, award it (Plaintiff) the damages it has suffered as a result of R&R's allegedly contemptuous actions.  Therefore, the Court finds that it has disposed of fewer than all of the Plaintiff's claims in this multi-claim litigation.  Moreover, the Sixth Circuit reiterated in Lowery that, for purposes of Rule 54(b), a claim represents "the aggregate of operative facts which give rise to a right enforceable in the courts."  426 F.3d at 821 (internal quotation marks and citations omitted).  Herein, the core of operative facts giving rise to the Plaintiff's request to hold R&R in civil contempt are unrelated to those giving rise to the claims in its Second Amended Complaint, on which the Court has granted summary judgment to the Defendants.  The contempt proceeding is predicated upon the allegation that R&R has violated the agreed Protective Order (Doc. #132), entered by the Court during this litigation, not upon the allegations upon which the Plaintiff based its claims against R&R in its Second Amended Complaint, substantive claims predicated upon events which, in the main, occurred before this litigation was initiated.

Second, in General Acquisition, the Sixth Circuit also held that a District Court cannot enter final judgment pursuant to Rule 54(b), unless it finds that there is no just cause for delay.  In Corrosioneering, Inc. v. Thyssen Environmental Systems, Inc., 807 F.2d 1279 (6th Cir. 1986), the Sixth Circuit indicated that a District Court should consider the following factors before making such a finding:

> (1) the relationship between the adjudicated and unadjudicated claims;
> (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in

> set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

Id. at 1283.

Herein, an application of those factors causes this Court to find that there is, indeed, no just cause for delay.  There is no relationship between the adjudicated claims and the civil contempt proceeding.  It is inconceivable that the need for appellate review of this Decision will be mooted by this Court's ruling in the civil contempt matter.  In addition, there is no possibility that the Sixth Circuit will be required to review this Court's Decision granting the Defendants' Motions for Summary Judgment (Docs. ##108 and 109), on a second occasion, based upon its rulings on the contempt issue.  The fourth factor is inapplicable.  Finally, a practical consideration most strongly supports the finding of no just cause for delay.  Below, this Court vacates the agreed Protective Order (Doc. #132), albeit delaying the execution/implementation of that vacation order for 21 days, thus affording Plaintiff the opportunity of obtaining relief from the Sixth Circuit in the form of an injunction or stay pending appeal.  However, the Court would not be inclined to grant such temporary stay or injunction, pending the resolution of the contempt procedure, due to the economic hardship that the time delay would visit upon Defendants, the parties that have prevailed on Plaintiff's claims against them.  Therefore, the Plaintiff will have the opportunity of obtaining such relief from the Sixth Circuit before the resolution of the request to hold R&R in contempt, only if this Court enters final judgment in accordance with Rule 54(b).

Accordingly, the Court expressly directs that final judgment in favor of Defendants and against Plaintiff on all claims set forth by Plaintiff in its Second

Amended Complaint (Doc. #103) be entered in accordance with Rule 54(b).  In addition, the Court finds that there is no just cause for delay.  This Court also vacates the agreed Protective Order (Doc. #132), which it entered on January 30, 2007.[40]  The vacation of that Order will be delayed for a period of 21 calendar days, in order to permit the Plaintiff to seek an injunction or stay pending appeal from the Sixth Circuit.

Counsel will note that the Court has scheduled a telephone conference call on August 7, 2007, at 4:30 p.m., for the purpose of setting procedures leading to the resolution of Plaintiff's Motion for Order to Show Cause (Doc. #192) and R&R's Motion to Strike Plaintiff's Motion for Order to Show Cause or, in the alternative, to Disregard the Affidavit of Vincent Esposito (Doc. #204).  While not directly involved with those matters, counsel for Schimmang should participate in that conference call.

August 7, 2007

/s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.

---

[40]One could argue that the agreed Protective Order (Doc. #132) terminates by its own terms with the entry of this Decision, given that it provides that it shall terminate at the conclusion of the trial of this litigation.  Since this Court has entered summary judgment in favor of the Defendants, there will be no trial herein. That argument is, however, moot, as a result of the Court vacating that Order.